**In the**
**UNITED STATES DISTRICT COURT**
**for the SOUTHERN DISTRICT OF INDIANA,**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| CHESTER LIVELY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| *v s.* | ) **CAUSE NO. 1:06-cv-1377-SEB/JMS** |
| | ) |
| PSI ENERGY, INC.; CINERGY CORP.; | ) |
| DUKE ENERGY ONE, INC., f/k/a Cinergy | ) |
| One, Inc.; and DUKE ENERGY | ) |
| CORPORATION, f/k/a Duke Energy Holding | ) |
| Corp., | ) |
| | ) |
| Defendants. | ) |

**E N T R Y**
**on Defendants' Motion for Summary Judgment (doc. no. 59)**

This case is an action by Plaintiff Chester Lively against his former employer for

violation of the Americans with Disabilities Act (42 U.S.C. § 12101, *et seq.*) ("ADA").  Mr.

Lively alleges that he suffers from a back impairment and claims that the defendants failed to

reasonably accommodate his disability when they refused to modify their policy to permit him to

work while taking two pain relievers, both of which contain narcotics.  Defendants now move for

summary judgment.

**Facts**

On August 1, 2001, Mr. Lively was hired as a Relay Technician by Defendant PSI

Energy, Inc., a wholly-owned subsidiary of Defendant Cinergy Corp. ("Cinergy").  About a year

later, he was placed on "extended leave" from September 3, 2002 through October 22, 2002,

when he underwent back surgery.  Soon after returning to work, in November 2002, he was

1

selected for a position in the Control Center as a Distribution Coordinator.  This position required Mr. Lively to oversee the planned and emergency interruptions of flow on the power grid without damaging equipment, disrupting service, or injuring personnel in the field.  Mr. Lively wrote instructions for each procedure and oversaw the men in the field who de-energized and re-energized the electrical lines.  He was also responsible for ensuring that the instructions written by his fellow distribution coordinators were correct.  Because the system requires constant monitoring and maintenance, the Control Center is staffed 24 hours a day, with distribution coordinators working 12-hour rotating shifts.  Shifts are scheduled a year in advance. At the time Mr. Lively worked at the Center, there were a total of sixteen distribution coordinators employed.

Upon beginning work in the control center in November 2002, Lively spent the first few months in the trouble coordinator position, which provides training for the distribution coordinator position.  Approximately six months thereafter, Mr. Lively took a second extended leave in connection with a second back surgery, during which time he was placed on short-term disability, from July 14, 2003 through January 18, 2004, when his short-term benefits ran out. When he returned to work as distribution coordinator, he had no medical restrictions.

Approximately nine months later, Mr. Lively underwent further treatment for his back problems.  He was placed on short-term disability from September 24, 2004 through March 31, 2005.  As his disability-leave benefits neared exhaustion, Mr. Lively inquired about returning to work and informed his supervisors that he was using Duragesic, a prescribed morphine patch which provides a continuous-release dosage of morphine into the bloodstream .  Mr. Lively's

supervisors advised him that the Company's rules prohibited him from returning to work while taking narcotic drugs and they recommended accordingly that he apply for long-term disability until he could return to work without requiring narcotics.  Mr. Lively applied for, and was placed on, long-term disability beginning in April 2005.  In July 2005, he met with two supervisors, Tony Geswein and Danny Williams, to discuss his physical progress and the status of his medical leave and treatment, during which meeting, Mr. Lively revealed the nerve stimulator that was implanted in his back and reported that he was continuing to use the Duragesic patch.

Mr. Lively continued on long-term disability through approximately September 15, 2005, when the company's insurance carrier suspended coverage due to a lack of status reports from his doctor.  Following this suspension, Mr. Lively returned to work at PSI Energy and presented a release from his doctor indicating that he was able to do so without restrictions.  Mr. Lively also submitted copies of two prescriptions for morphine and the Duragesic patch which he was still required to take.  Mr. Geswein and Mr. Williams sent the medical release and copies of the prescriptions to Dave Crail, Senior Human-Resources Consultant, who was employed by Cinergy Services, Inc., another subsidiary of Cinergy.  Mr. Crail, in consultation with an on-staff nurse, determined that, because the prescriptions were for narcotics, the company policy prohibited Mr. Lively from returning to work.  In a September 22, 2005 meeting, Mr. Geswein and Mr. Williams conveyed Mr. Crail's determination to Mr. Lively and discussed the effects on operations of absences.  Mr. Lively was given two weeks within which to provide the insurer with updated information that would allow him either to return to long-term disability status or return to work without taking narcotic medications, or he could be terminated for his continued absences and his related failures to keep them informed as to his medical status.  During this

3

interval, Mr. Lively was placed on unpaid leave of absence.  Mr. Crail requested a reconsideration by the insurance carrier of Mr. Lively's claim and worked with the carrier and Mr. Lively over the next months to that end.

On October 28, 2005, Mr. Lively filed a charge of disability discrimination with the EEOC against Cinergy.  The EEOC urged Mr. Lively to make use of the internal Reasonable Accommodation Committee ("RAC") at PSI Energy as provided for in the company procedure manuals.  Mr. Lively telephoned the employee hotline on December 27, 2005, and requested consideration by the RAC.  Mr. Crail returned Mr. Lively's call to explain that the RAC required medical documentation to support his claim of disability and to request a description of his preferred accommodation.  Mr. Lively explained to Mr. Crail that, rather than secure an accommodation, he simply wanted to return to his job.  Following this conversation, Mr. Crail sent Mr. Lively a letter reiterating the procedure for submitting information to the RAC for consideration.  Mr. Lively did not submit any information, medical or otherwise, to the RAC or to anyone else at PSI Energy concerning his disability or to request an accommodation.

In June 2006, after learning that Mr. Lively had accepted other employment, PSI Energy informed him that it considered his actions to be a voluntary resignation and that his employment was therefore terminated.

To fully understand the relationships among Defendants, a brief explanation of PSI Energy's corporate structure would be helpful.  The Duke/Cinergy family of companies merged in April 2006 creating the following structure:

• PSI Energy, Mr. Lively's employer, was renamed Duke Energy Indiana, Inc. ("Duke

Indiana").[1]  Duke Indiana is not named *per se* as a defendant here, but is one, in fact, because it is the undisputed successor to PSI Energy, which is named as a defendant.

- Cinergy continued by name and structure as the parent of the newly-renamed Duke Indiana, but became a wholly-owned subsidiary of Duke Energy Corp. ("Duke Holding") (f/k/a Duke Energy Holding Corp.).  Cinergy and Duke Holding are both defendants.

- A separate Cinergy-family affiliate, Cinergy One, Inc., was renamed as Duke Energy One, Inc. ("Duke One"), which is a wholly-owned subsidiary of Duke Technologies, Inc., another subsidiary of Duke Holding.  Duke One is a named defendant here; but neither Cinergy One nor Duke Technologies was named as a defendant.

- Another separate Cinergy-family affiliate, Cinergy Services Inc., was renamed Duke Energy Shared Services, Inc. ("Duke Services") and became a subsidiary of Duke Holding.  Neither Cinergy Services nor Duke Services is named as a defendant in this action.

To summarize, Duke Holdings is the parent of three subsidiaries involved in this cause: Cinergy, Duke Technologies, and Duke Services.  Of these, only the parent, Duke Holdings, and one subsidiary, Cinergy, are actual, named defendants.  Cinergy, in turn, is the parent of Duke Indiana, which is also a defendant.  Finally, Duke Technologies is the parent of Duke One and neither is a defendant.  At all times relevant to this suit, it is undisputed that neither Duke Holding nor Cinergy had employees.

---

[1] Unless otherwise indicated, the corporate entities will be referred to by their post-merger names, even when discussing pre-merger facts.

5

Mr. Lively was employed by Duke Indiana, which had hired him, paid him his salary, and granted him employment-related benefits.  His two immediate supervisors — Jim Connors, who was Mr. Lively's immediate supervisor, and Danny Williams, who was Mr. Connor's boss — also worked for and were paid by Duke Indiana.  The next higher level of management was Tony Geswein, who as a manager worked for and was paid by Duke Services.  Like Mr. Geswein, Dave Crail, who was the Human-Resources Manager, was employed and paid by Duke Services.

On October 28, 2005, Mr. Lively filed with the Equal Employment Opportunity Commission ("EEOC") a charge of disability discrimination against "Cinergy."  On June 14, 2006, the EEOC issued its "Dismissal and Notice of Rights" dismissing his claim on the ground that, "based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes" and authorizing him to file suit, which Mr. Lively did on September 15, 2006.

**Discussion**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Although all reasonable inferences from the evidence shall be drawn in favor of the non-moving party, the non-moving party cannot rest upon his pleadings but must demonstrate a genuine issue of material fact by presentation of specific evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**Mr. Lively's Employer.**  Defendants first argue that Duke Holding, Cinergy, and Duke One must be dismissed because none was Mr. Lively's employer.  The ADA defines an employer as "a person engaged in an industry affecting commerce who has 15 or more employees . . . and any agent of such person . . . ."  42 U.S.C. § 12111(5).[2]  Defendants contend that Mr. Lively was employed solely by Duke Indiana based on the facts that Duke Indiana paid his salary and employed his two immediate supervisors.  Mr. Lively does not dispute that he was employed by Duke Indiana; instead, he contends that Duke Holding, Cinergy, and Duke One should *also* be deemed his "employer" under the ADA as one, aggregated whole.

Putatively-independent entities can be deemed one employer under the ADA in any one of three situations.  The first is when the traditional criteria are met for "piercing the corporate veil," allowing creditors to sue a corporation's parents and affiliates.  *Papa v. Katy Industries, Inc.*, 166 F.3d 937, 940-41 (7th Cir.), *cert. denied*, 528 U.S. 1019, 120 S.Ct. 526, 145 L.Ed.2d 408 (1999).  "If because of neglect of corporate formalities, or a holding out of the parent as the real party with whom a creditor nominally of a subsidiary is dealing, a parent (or other affiliate) would be liable for the torts or breaches of contract of its subsidiary, it ought equally to be liable for the statutory torts created by federal antidiscrimination law."  *Id.*, 166 F.3d at 941.  The second situation is where an entity splits itself into separate affiliates, each with less than the statutory threshold of employees, for the express purpose of avoiding liability under the antidiscrimination laws.  "[I]f the purpose of this splintered incorporation were to elude liability .

---

[2] An "employee" is, unsurprisingly, "an individual employed by an employer."  42 U.S.C. § 1211(4).  The ADA's prohibition against discrimination and requirement for reasonable Accommodation apply to any "covered entity" which is defined as "an employer, employment agency, labor organization, or joint labor-management committee."  42 U.S.C. § 12111(2).

. . the corporations should be aggregated to determine how many employees each corporation had." *Id.*  The third situation is where the parent or affiliate itself directed the discriminatory acts or policy alleged.  "In that event, the parent, provided that the sum of its employees and those of the subsidiary employing the plaintiff exceeded the statutory minimum, would be the violator." *Id.  Worth v. Tyer*, 276 F.3d 249, 259-61 (7th Cir. 2001).

Mr. Lively has neither alleged nor shown that PSI Energy (pre-merger) or Duke Indiana (post-merger) had fewer than fifteen employees at any period that is relevant to his ADA claim. His argument for corporate aggregation, therefore, is not based on avoiding the "tiny employer exemption" of the ADA.  Instead, he argues that the Defendants collectively should be deemed his "employer" for two reasons:  because "each of the Defendants under the Cinergy and Duke umbrellas [1] entered into the decision making process and [2] held themselves out as Lively's employer."  (Plaintiff's Response (doc. no. 63), p. 12).

To support his first argument for aggregation, Mr. Lively points to the facts that (1) Dave Crail, the Senior HR Consultant who advised, participated in, and was the resource and authority for, decision-making regarding Mr. Lively's employment status, was employed by Duke Services; (2) Mr. Crail was Mr. Lively's "substantive contact" for the RAC process; and (3) Mr. Geswein, Mr. Lively's third-level supervisor, who communicated with him regarding, and participated in determining, his employment status, was also employed by Duke Services. However, although Mr. Crail's and Mr. Geswein's involvement in decisionmaking regarding the alleged discrimination against Mr. Lively might have been a sufficient basis for aggregation under *Katy* and *Worth*, Mr. Lively did not name Duke Services as a defendant and did not allege

8

or show that any of the named Cinergy or Duke Defendants directed Mr. Crail's or Mr. Geswein's alleged discriminatory decisions.  Therefore, there is no basis for aggregation on this ground.

To support his second ground for aggregation — that the other entities held themselves out as his employer — Mr. Lively relies on the following allegations:  (1) In January 2006, Mr. Crail sent a letter, on "Cinergy Corp." letterhead, to Mr. Lively regarding the RCA process, (Plaintiff's Response, Exhibit J); (2) in June 2006, Mr. Geswein sent a letter, on Duke Holding letterhead, to Mr. Lively notifying him that, since being informed by the EEOC that he had accepted other employment, "the Company" considered his employment to be voluntarily terminated, (*id.*, Exhibit M); (3) in his deposition, Mr. Williams, Mr. Lively's second-level supervisor, stated that Mr. Lively "would have been employed by PSI, Cinergy/PSI", (*id.*, Exhibit L, p. 25, ll. 5-15); (4) in December 2005, Mr. Williams sent a letter, on Cinergy letterhead, to Mr. Lively regarding the status of his employment and his disability-insurance claim, (*id.*, Exhibit N); (5) the disability-insurance carrier communicated the claim information in the letter to Mr. Crail and Mr. Crail passed it on to Mr. Williams, (*id.*, Exhibit L, p. 24, l. 18 to p. 28, l. 19); (6) Mr. Williams testified that he, instead of Mr. Crail or Mr. Connors, wrote the letter regarding the disability claim because Mr. Lively was in Mr. Williams' department and Mr. Williams sends out all department correspondence, (*id.*); (7) Mr. Williams testified that the Cinergy letterhead stationery was the only letterhead used in his department, (*id.*); (8) Mr. Lively received a two-page "Cinergy Certificate of Group Health Coverage" dated October 31, 2005 on "Cinergy" letterhead which listed the start and end dates of medical and dental coverage and listed the plan administrator as "Cinergy Corp.", (*id.*, Exhibit V), which Mr. Lively argues

9

indicates that his employer was Cinergy; (9) Mr. Lively received four "Duke Energy Conversion Notices" dated July 13, 2006 on Duke Holding letterhead advising him of the option to convert employer-provided insurance policies to personally-owned policies;[3] these notices identified Mr. Lively's "Employer Name" as Duke Holding, (*id.*, Exhibit O); (10) although Mr. Lively named only "Cinergy" in his October 28, 2005 EEOC charge, (*id.*, Exhibit P), and the EEOC's notice was directed to only "Cinergy/PSI", (*id.*, Exhibit Q), corporate counsel submitted a letter to the EEOC memorializing an orally-granted extension of time on Cinergy Services letterhead *via* a facsimile transmission which included a facsimile cover sheet bearing a "Cinergy Legal Department" header, a "Cinergy" logo, and a "Cinergy Corp." return street address, (*id.*, Exhibit R); (11) counsel subsequently submitted a position statement on behalf of "PSI Energy" (pre-merger) on Cinergy Services letterhead, (*id.*, Exhibit S); (12) citing an April 20, 2006 letter on Duke Holding letterhead to the EEOC, (*id.*, Exhibit T), Mr. Lively states that corporate counsel thereafter corresponded with the EEOC on Duke Holding letterhead.[4]

Mr. Lively has not alleged any neglect of corporate formalities respecting Duke Holding, Cinergy, or Duke One; his sole ground for aggregation is that all of these entities held themselves out as his employer. He does not rely, however, on any direct statements to him that his employer was one or more of these entities or that it was not PSI Energy. Further, he does not establish through his own testimony — indeed, he stops short of even asserting — that he was confused or misled about the true identity of his employer when he was hired or during the

---

[3] This conversion notice, apparently regarding life-insurance policies, was sent after Duke Indiana had deemed Mr. Lively's employment to have been voluntarily terminated.

[4] None of the cited evidence is on Duke One letterhead or refers to Duke One.

time of his employment.  Instead, he seeks to rely primarily on indirect evidence of stationery letterheads on various pieces of correspondence that were sent to him beginning in late October 2005.  When evaluating such evidence in determining issues of corporate aggregation, it is important to note that the integration of operations among affiliates, by itself, does not support a finding of aggregation.  *Worth*, 276 F.3d at 260 ("this Circuit no longer applies the 'integrated enterprise' test to Title VII claims"); *Papa*, 166 F.3d at 942 (there is no difference under the ADA if a subsidiary obtains integration of its pension plan, legal and financial advice, or payroll function from its parent rather than independent contractors).

The evidence here indicates that operations for certain administrative matters — such as employee benefits, ADA reasonable-accommodation procedures, and legal services — were performed for PSI Indiana by its affiliate Cinergy Services through its parent Cinergy. Therefore, the fact that correspondence relating to these matters carries a Cinergy or Cinergy Services letterhead  supports an inference only of integrated operations, not of identity of employer.  The October 28, 2005, submissions by Defendants to the EEOC; the October 3, 2005, correspondence regarding Mr. Lively's medical coverage;[5] the fact that the insurance carrier gave information to Mr. Crail regarding the status of Mr. Crail's insurance claim, which Mr. Crail then passed on to Mr. Williams and was then included in Mr. Williams' December 2005 letter to Mr. Lively; and the January 2006 correspondence regarding the status of the RCA proceedings all fall into this category and do not support an argument for aggregation.

---

[5] That the plan administrator of Mr. Lively's medical plan is identified as Cinergy obviously does not support an inference that Cinergy is his employer.

Mr. Williams's deposition testimony that Mr. Lively "would have been employed by PSI, Cinergy/PSI" is at best ambiguous.  Mr. Williams's first answer that Mr. Lively was employed by "PSI," which he then augmented with "Cinergy/PSI," and the fact that no entity named "Cinergy/PSI" exists, might have prompted Plaintiff to further develop or clarify Mr. Williams's answer.  As it stands, the inference that Mr. Williams was merely referencing the "family" or parent to which PSI belonged is at least as strong as any inference that Mr. Lively was employed by Cinergy.  At any rate, having come long past the events at issue in this case, Mr. Williams's deposition testimony cannot be accurately characterized as a "holding out" of Cinergy to Mr. Lively as his employer on which representation he relied or by which he was deceived in any manner relevant to his claim.

 Although the April 26, 2006, letter to the EEOC from senior counsel in response to a request for additional information regarding Mr. Lively's complaint is on Duke Holding letterhead, it explicitly states in the opening paragraph that Mr. Lively was "a Distribution Coordinator with PSI Energy, Inc. (now doing business as 'Duke Energy Indiana, Inc.' and hereinafter referred to as the 'Company')" and, throughout the letter, counsel wrote on behalf of the "Company," *i.e.*, PSI Energy, Inc., not Cinergy, Duke Holding, or Duke One.  Similarly, although counsel's December 8, 2005 position statement submitted to the EEOC was on Cinergy Services letterhead, the first paragraph states explicitly that "[t]his letter constitutes the position statement of PSI Energy, Inc. . . . in response to the Charge of Discrimination . . . ." and, in a footnote to this sentence, states that PSI Energy, Inc. is Mr. Lively's "actual employer" and not "Cinergy," which he named in his complaint.  Indirect and uncertain inferences from correspondence letterheads do not create an issue of fact about the identity of Mr. Lively's

employer when such inferences are contradicted by explicit statements in the texts of the correspondence.

Although the June 2006 letter from Mr. Geswein to Mr. Lively advising him that he was considered to have voluntarily resigned is on Duke Holding letterhead, the letter was received after the events that are relevant to Mr. Lively's claim occurred.  Thus, he could not be deemed to have relied on it as a source of any confusion regarding the identity of his employer. Likewise, the benefits-conversion notices sent to Mr. Lively after his deemed voluntary resignation from Duke Indiana could not have been responsible for any reliance or deception regarding his employer during the time period relevant to his claim.

Finally, Mr. Williams's testimony that the only stationery that he had available for official correspondence bore the Cinergy letterhead is meaningless without additional evidence that the stationery was used to communicate specifically to Mr. Lively that Cinergy was his employer.

Therefore, based on our careful evaluation of the evidence submitted here, we conclude that Mr. Lively has failed to created a genuine issue of material fact that Duke Holding, Cinergy, Duke One, and/or Duke Services should be considered collectively with Duke Indiana as his employer for purposes of his ADA claim.  His argument fails for a legal reason as well.  To prevail on an employer-aggregation claim, a plaintiff must show, first, "such unity of interest and ownership . . . that the separate personalities . . . no longer exist" — which he has failed to do — and, second, "circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice."  *Worth*, 276 F.3d at 260.  Mr. Lively has

not alleged or shown how not aggregating Defendants would sanction a fraud or promote injustice. He has not asserted, for example, that he relied on any of Defendants' alleged representations to his detriment or that recognizing Duke Indiana alone as his employer will prevent a full recovery in this action due to, for example, undercapitalization or other financial inability, or that Defendants purposely structured themselves for this purpose.

Because Plaintiff has not shown that a genuine issue of fact exists as to the aggregation of Duke Holding, Cinergy, and/or Duke One as his employer, these Defendants are entitled to judgment of dismissal as a matter of law.

**Disabled status.** The ADA prohibits discrimination against a "qualified individual with a disability," 42 U.S.C. § 12112(a), which means "an individual with a disability who, with or without reasonable Accommodation, can perform the essential functions of the employment position that such individual holds or desires," 42 U.S.C. § 12111(8). A disability is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12101(2). In his response to Defendants' motion, Mr. Lively presented evidence that his back impairment substantially affected his ability to perform major life activities at the times relevant to his claim. Defendants did not contest this evidence and we deem it sufficient to create a genuine issue of fact regarding whether Mr. Lively was disabled under the ADA.

**Qualified for work.** Defendants contend that, even if he was disabled, Mr. Lively was not qualified for his position at Duke Indiana because of his use of narcotic medications and his

absenteeism.  Defendants assert that Mr. Lively's safety-sensitive position in the control center requires unimpaired mental acuity[6] which is inconsistent with his use of narcotic medications.  In response, Mr. Lively submitted the results of a cognitive-function test that he underwent at the Indiana University School of Medicine Department of Psychiatry and Neuropsychology Clinic that found that he had normal cognitive function while on his prescribed dosages of medication. Defendants did not request thatMr. Lively be independently tested and did not contest the findings of this evaluation.  As such, Mr. Lively has shown a genuine issue of fact as to whether he had the mental acuity to perform the essential functions of his position, with or without accommodation.

Defendants argue that, because Mr. Lively was absent more days than he worked, and attendance is an essential requirement for his position, that he was not a qualified individual with a disability.  Mr. Lively's absences due to his operations, however, were approved and acquiesced-in by Duke Indiana and each time it informed him that he could return to work once he stopped taking narcotic medications; it did not take the position that his past absences due to surgeries and procedures were alone grounds to terminate him.  Mr. Lively claims discrimination only for the period when he wanted to return to work but Duke Indiana refused to allow him to do so as long as he was taking narcotic medications.  When Mr. Lively desired to return to work in March 2005, after his third back procedure, he was told that he could not return while on the medications and was advised to go on long-term disability status until he could stop taking the medications.  When coverage was suspended in September 2005, Mr. Lively again

---

[6] Defendants raised no issue regarding Mr. Lively's *physical* ability to perform the requirements of his position.

communicated his desire to return to work and presented his doctor's release without restrictions, but Duke Indiana again refused to return him to work because he was still taking narcotics. Instead of allowing him to return to work, Duke Indiana placed him on unpaid leave to give him time either to get long-term disability coverage reestablished or to stop the medications, and it worked with the insurance carrier over the next few months to try to get him reestablished.[7] However, at this time, and when he initially wanted to return to work in March 2005, Duke Indiana indicated to Mr. Lively that, if coverage could not be reestablished and he could not stop the narcotic medications, his absences could lead to termination.

Because Mr. Lively contends that he was able and willing to return to work without restrictions on and after March 31, 2005, but was refused due to Duke Indiana's unlawful discrimination, whether Mr. Lively's absences justified Duke Indiana's termination of him is a jury question.

**Policy Accommodation.**  Defendants argue that they are due summary judgment because the ADA does not require them to change their safety-related no-narcotics work rule as a reasonable Accommodation for Mr. Lively.  They rely on decisions that hold that it is not a reasonable Accommodation for employers to alter safety-related rules in order to accommodate an employee's disability.  *See*, *Williams v. United Ins. Co. of America*, 253 F.3d 280 (7th Cir. 2001); *Pernice v. City of Chicago*, 237 F.3d 783 (7th Cir. 2001); and *Pittari v. American Eagle*

---

[7] Duke Indiana initially gave Mr. Lively two weeks to reestablish coverage, but it continued to work with the insurer long after that time and it, in fact, took no action to change Mr. Lively's (unpaid) employment status until July 2006 when it learned that he had accepted other employment.

*Airlines, Inc.*, 468 F.3d 1056 (8th Cir. 2006).[8]  But in these cited cases, there was no question about the safety-sensitivity of the rule's application in the employee's case or about the employee's failure to meet the rule.  In the present case, Mr. Lively has presented a medical evaluation that his use of the prescribed narcotics did not impair his cognitive abilities.[9]  The ADA provides explicitly that a reasonable Accommodation "may include . . . modification of equipment or devices, appropriate adjustment or modification of examinations, training materials, *or policies* . . . ."  42 U.S.C. § 12111(9)(B) (emphasis added).  This, again, is a jury question whether a modification to Duke Indiana's no-narcotics rule in Mr. Lively's case would have been a reasonable Accommodation required under the ADA.

**Failure to inform.**  Defendants argue that they are not liable under the ADA because Mr. Lively never informed them that he was an individual with a disability and, thus, fell under the protection of the ADA.  This is a dispositive issue because, unless Duke Indiana was aware that Mr. Lively was substantially limited in a major life activity, it was under no obligation to reasonably accommodate his desire to return to work while taking his prescribed narcotic medications.  Duke Indiana would have been entitled to strictly enforce its no-narcotics rule regardless of the medications' effects on Mr. Lively's cognitive abilities.  An employee has a duty to inform his employer that he has a disability.  *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568 (7th Cir. 2001).

---

[8] Defendants also cited an unpublished opinion of the Court of Appeals for the Seventh Circuit:  *Fogle v. Ispat Inland, Inc.*, 32 Fed. Appx. 155 (7th Cir. 2002).

[9] Mr. Lively did not dispute Defendants' assertions that a certain level of mental acuity is essential to his Control-Center position.

Mr. Lively does not dispute that he did not inform Duke Indiana that he was disabled and that his supervisors were otherwise unaware of his impairment.  He does not contest that all that his supervisors and Mr. Crail knew about his condition was that he had completed back surgeries, that he was on narcotic medications, that he reported to them that he had no work restrictions, and that he had a release to work without restrictions from his doctor.  He also does not contest that Mr. Crail asked him orally and in writing, at least twice, to submit any available medical support for a disability status under the ADA and that they could offer no Accommodation without a claim and proof of disability.

Instead, Mr. Lively asserts that he did not advise Defendants about his disability because they misled him about what accommodation were possible.  He asserts that Mr. Crail led him to believe that the provision of special equipment was the only Accommodation that was available, (Plaintiff's Response, p. 5), and because Mr. Lively did not need special equipment — what he needed was an exception to the no-narcotics rule — he came to the "logical conclusion" that the reasonable-Accommodation process was futile, (*id.*).  Therefore, he did not respond to Defendants' requests for explanation and evidence of his disability status.  In other words, he contends that Defendants short-circuited or prevented the required interactive process from taking place through which, presumably, he would have informed him that he qualified as disabled under the ADA.  He also contends that Mr. Crail had decided back in September 2005 that he didn't want him to return to work based on the alleged statement by Mr. Crail that he "[d]idn't want [Lively] fighting to get a release back to work only to be terminated."  (*Id.*).[10]

_____

[10] It is undisputed that, in September 2005, Defendants were unaware of Mr. Lively's alleged disability.  They knew that he had denied any work limitations and had a full work

Mr. Lively cites the following deposition passages in support of his assertion that

Defendants misled him about available accommodation.  (Plaintiff's Response, pp. 5-6).  First,

from Mr. Crail's deposition:

> Q   Okay.  Did you and Mr. Lively discuss specific equipment that RAC could
> provide to assist with this disability?
>          MS. JOHNSON:  I'm going to object to the form of the question.  It
> presupposes that he had a disability or that there was one.
> Q   Did you discuss specific equipment with Mr. Lively?
> A   I explained what the RAC was all about, things that we could do.  I
> typically do this to anybody that I talk to about the RAC, is just gives [*sic*] them
> an example of something that we could do or can do based upon information
> that's supplied to us.
>          I typically always give the example of having a back problem and needing
> a special chair, or having problems with carpal tunnel and needing a special
> keyboard or monitor or something like that.  It's an example and I make sure they
> understand that because, again, it may not be germane to their situation.  I just
> give them an example of some things that we can do.

(Plaintiff's Response, Exhibit D, p. 82, l. 16 to p. 83, l. 12).  Second, Mr. Lively cites his own

deposition testimony:

> Q   When you say earlier you told Mr. Crail that you did not need a reasonable
>       Accommodation, what did you mean by that as a layperson?
> A   I didn't need a piece of equipment to do my job.  You know, for example, I
>       didn't need a keyboard or special mouse or special chair.  All I wanted was to
>       return to work.
> Q   Was it your understanding that the RAC was there to provide equipment?
> A   Yes, that was the — when I first talked to Mr. Crail, that was his explanation
>       of the Reasonable Accommodation Committee.
> Q   You got that understanding from him?
> A   Yes, that they were in the, you know, special chairs, keyboards, mouses,
>       ramps, you know, accessible to restroom, things of that nature.
> Q   Did he understand that what you were seeking was to return to the job you
>       had?
>          MR. DUE:  Objection.  He doesn't know what Mr. Crail understood or

---

release from his doctor, and Mr. Lively would not initiate the RAC process for another 3 months.
Mr. Crail's statements at this time, therefore, cannot show an improper bias or prejudgment
under the ADA.

didn't understand.
BY MS. HATTAWAY:
Q   Did you express to Mr. Crail —
A   Several times, yes.
Q   — that you wanted to return to your job and be allowed to take your
    medications?  Was that a "Yes"?
A   Several times, yes, sorry.

(*Id.*, Exhibit C, p. 192, l. 8 to p. 193, l. 10).

Mr. Lively argues that "Defendants have muddied the record from the outset by incorrectly telling Lively what an Accommodation is or should be.  Lively has remained confused throughout this action about what an Accommodation is, based on incomplete instructions and explanations by Defendants' employees and representatives."  (Plaintiff's Response, p. 5).  But, at most, the passages on which he relies demonstrate his own misinterpretation of what he was told by Mr. Crail.  He offers testimony only of what he "understood" Mr. Crail to have meant, but he does not deny that Mr. Crail gave *examples* of accommodation under the ADA.  Those examples pertained to the provision of equipment, which Mr. Lively, for whatever reason, took to be an exhaustive category of available accommodation.  But there is no evidence that Mr. Crail stated, indicated, or suggested that special equipment was the *only* type of Accommodation required under the ADA, available from Duke Indiana, or that Duke Indiana was willing to provide.

Mr. Lively does not deny that Mr. Crail further explained that his illustrations were only examples that might not be germane to a particular employee's situation.  Mr. Lively contends that Mr. Crail's discussion of available accommodation were "incomplete" and they undoubtedly were:  while he did mention the provision of special equipment, he did not mention policy

20

modifications as a possible Accommodation, but he also did not mention myriad other categories of accommodation, such as "job restructuring, part-time or modified work schedules, reassignments to a vacant position, . . . appropriate modifications of examinations, training materials . . . the provision of qualified readers or interpreters, and other similar accommodation . . . ." 42 U.S.C. § 12111(9)(A) and (B).  Mr. Crail testified that he and the RAC did not engage in a reasonable-Accommodation analysis with Mr. Lively because Mr. Lively never suggested, intimated, asserted, let alone provided evidence of, any kind of disability that would have required consideration for Accommodation under the ADA.  Mr. Lively simply stated that he was able to work without restriction and wanted an exception to the no-narcotics rule so that he could return to work.  Without some evidence of a qualifying disability, which would have triggered obligations under the ADA, it was not improper for Defendants to strictly enforce their no-narcotics rule and to not offer accommodation.

Therefore, it was not unreasonable or deceptive for Defendants not to undertake a comprehensive and exhaustive explanation of all possible accommodation for all possible disabilities from which Mr. Lively might have been suffering.  No authority for such a duty has been cited and we know of none.  On the facts as presented, we conclude that Defendants did not deceive or mislead Mr. Lively about the RAC process.  They repeatedly offered the RAC process to him and asked him at least twice for medical support of a qualifying disability, of which they were entirely ignorant.  None was forthcoming because Mr. Lively claims that *he* "understood" the result of the process to be fruitless.  He cites no authority for the proposition, however, that employers may be held liable under the ADA if an employee fails to inform his employer of a disability and fails to engage in the interactive process because of his own unilateral mistake of

the process or his rights under the Act.  It is unfortunate that Mr. Lively did not follow through with the RAC process that was offered to him.  We cannot conclude that, had he done so, the result would not have been different.

Because Mr. Lively has not established a genuine issue of fact regarding whether he informed his employer that he was a qualified individual with a disability and because that is an essential element of his claim without which proof he cannot prevail, Defendants are due judgment as a matter of law on his claim of disability discrimination under the ADA. Defendants motion accordingly is **GRANTED**.

Date:   12/17/2007

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Robyn Rebekah Willson Hattaway
reuben@reubenlaw.net

Ariane Schallwig Johnson
DUKE ENERGY SHARED SERVICES
ariane.johnson@duke-energy.com

Jeffery M. Mallamad
BINGHAM MCHALE LLP
jmallamad@binghammchale.com

Jill T. O'Shea
DUKE ENERGY SHARED SERVICES, INC

139 E Fourth Street, 25 AT II
Cincinnati, OH 45201

Lawrence M. Reuben
Law Offices of Lawrence M. Reuben
reuben@reubenlaw.net